**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

:
DELLA R. HOLMAN,                          :
            Plaintiff                     :          CIVIL ACTION
                                          :
      v.                                  :          No. 04-2148
                                          :
JO ANNE B. BARNHART,                      :
Commissioner of                           :
Social Security,                          :
            Defendant_____:

**REPORT AND RECOMMENDATION**

CAROL SANDRA MOORE WELLS                                    June 28, 2005
UNITED STATES MAGISTRATE JUDGE

Della R. Holman ("Plaintiff") seeks judicial review of the final decision of the Commissioner

of the Social Security Administration ("Commissioner") for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.   Presently before this court

are the parties' cross-motions for summary judgment.   For the reasons set forth below, it is

recommended that the Plaintiff's Motion for Summary Judgment be GRANTED in part and

DENIED in part, the Defendant's Motion for Summary Judgment be DENIED, the Commissioner's

decision be VACATED, and the case be REMANDED for further development consistent with this

decision.

**I.  PROCEDURAL HISTORY[1]**

Plaintiff filed an application for DIB benefits on March 18, 2002, alleging disability since

March 30, 2001, from low back and hip pain that causes her difficulty walking, standing, and sitting.

(R. 54, 76-78, 82-84).  Her application was denied at the initial level, so Plaintiff requested a hearing

---

[1] I have reviewed and considered the following documents in analyzing this case: Plaintiff's Motion for Summary Judgment, Defendant's Answer and Motion for Summary Judgment and the Administrative Record ("R."), inclusive of all exhibits thereto.

(R. 40).   Administrative Law Judge ("ALJ") Janice C. Volkman continued an August 21, 2003 hearing to allow Plaintiff to obtain legal representation.  (R. 227).  On September 24, 2003, at a second administrative hearing, Plaintiff, represented by counsel, and a Vocational Expert ("VE") testified.  (R. 236).

On February 2, 2004, the ALJ, using the sequential evaluation process,[2] determined that Plaintiff could perform her past relevant work and, thus, was not "disabled" within the meaning of the Act.  Plaintiff requested review of the ALJ's decision, but the Appeals Council declined, rendering the ALJ's decision the final decision of the Commissioner.  Thereafter, Plaintiff filed the within complaint seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). This case was referred to the undersigned by the Honorable J. Curtis Joyner under the authority of 28 U.S.C. § 636(b)(1)(B), for preparation of a report and recommendation.

---

[2]The Social Security Regulations provide the following five-step sequential evaluation for determining whether or not a claimant is disabled:

> 1.  If the claimant is working, doing substantial activity, a finding of not disabled is directed.  Otherwise proceed to Step 2.  *See* C.F.R. §§ 404.1520(b); 416.920(b).
>
> 2.  If claimant is found not to have a severe impairment which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed.  Otherwise proceed to Step 3.  *See* C.F.R. §§ 404.1520(c); 416.920(c).
>
> 3.  If claimant's impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 of Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed.  Otherwise proceed to Step 4.  *See* 20 C.F.R. §§ 404.1520(d); 416.920(d).
>
> 4. If claimant retains the residual functional capacity to perform past relevant work, a finding of not disabled is directed.  Otherwise proceed to Step 5.  *See* 20 C.F.R. §§ 404.1520(e); 416.920(e).
>
> 5.  The Commissioner will determine whether, given the claimant's residual capacity, age, education and past work experience in conjunction with criteria listed in Appendix 2, he is or is not disabled.  *See* 20 C.F.R. §§ 404.1520(f); 416.920(f).

## II. <u>FACTUAL BACKGROUND</u>

A.  <u>Personal and Work History</u>

Plaintiff, born September 18, 1954, was 49 years old at the time of the administrative hearing held December 29, 2003; therefore, she was a "younger person"[3] under the Act.  (R.12, 54, 243).  Plaintiff has children; ages thirty-one and twenty four, who live out of the house and a sixteen year old who resides at home. (R. 221).  She has a high school education and a nursing assistant certificate. (R.13, 65, 243).  Although she has kept her driver's license current, Plaintiff stated she has not driven in years.  (R. 245).

In her disability application, Plaintiff reported her physical limitations as "difficulty in walking, standing, bending, and lifting" and surmised that these limitations were caused by a "pinch[ed] nerve on [her] left side." (R. 59, 163).  Plaintiff stated that this condition started several months prior when she experienced pain in her left great toe accompanied by burning and discomfort in her left foot and left leg.  (R. 163).

B.  <u>Plaintiff's Statements and Testimony</u>

At her hearing on December 29, 2003, Plaintiff testified that, although she was no longer working because of pain, she had worked as recently as May 2003 in a daycare position.  (R. 241-42).  Plaintiff worked as a nursing assistant from 1978 to 1985, a dietary aide from 1988 to 1990, a procurement clerk from 1990 to 1996, a nursing assistant from 1997 to 2001, and a childcare worker for one year in 2002.  (R. 60, 68, 241, 242).  While she worked as a procurement clerk at a nursing home  Plaintiff's duties included delivering merchandise to the floor, using a cart; she controlled inventories by hand, because computers were just being installed as she was leaving.  (R.

---

[3]  A "younger person" is under the age of 50.  "The Commissioner does not consider that age will seriously affect a younger person's ability to adapt to a new situation."  *See* 20 C.F.R. §§ 404.1563(c); 414.963(c).

239).  Also, while working as procurement clerk, Plaintiff was diagnosed with costochondritis.[4]  (R.

243).  She spent about 6 hours, the majority of her day, standing and lifted 25 to 40 pounds at a time.

(R. 240).  She worked in a nursing home from 1978 to 1990 and, again, from 1997 to 2001.  (R.241).

 In 2002, Plaintiff worked at a daycare center for almost a year, changing and feeding babies and

toddlers, but her supervisors were concerned she would drop the babies from the changing table.

(R. 242).  Furthermore, walking with the children posed problems; they would pull on her arms

causing discomfort.  (R. 242).  Plaintiff testified that her physical impairment forced her to resign

from her position in daycare.  Id.

Plaintiff testified that she shops and cooks; her sixteen-year-old daughter assists with meal

planning.  (R. 244).  Plaintiff visits her mother's house, four or five blocks away, by bus and

socializes and watches TV while there.  Id.  After Plaintiff's sister died in October of 2003, Plaintiff

complained of difficulty being sociable.  (R. 245).

Plaintiff was prescribed 300 milligrams of Neurontin[5] thrice daily, 2400 milligrams of

Ibuprofin,[6] Elavil,[7] Flexeril,[8] and Sonata.[9]  (R. 249).  As of the date of the hearing, Petitioner had

been seeing a counselor, Marina Cooney, M.D., bi-weekly since October of 2003, and a psychiatrist

monthly for treatment of her situational depression and anxiety attacks.  (R. 237, 253).  Physically,

---

[4]Costochondritis is an inflammation of a rib or the cartilage connecting a rib. This is a common cause of chest-wall pain. Inflammation or injury involving the chest muscles is another common cause of chest-wall pain.  National Institute of Health, *Medline Plus*, *at* http://www.nlm.nih.gov/medlineplus/ency/article/000164.htm.

[5]Neurontin is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in patients with epilepsy.  *Physician's Desk Reference* ("*PDR*"), Thompson, 59th Ed. 2589.

[6]Ibuprofen temporarily relieves cold, sinus, and flu symptoms: nasal and sinus congestion, stuffy nose, headache, sore throat, minor body aches and pains, fever.  *PDR* at 1938.

[7]Elavil- Tricyclic anti-depressants are used to relieve mental depression.  *Medline Plus*, *at* http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202055.html#GXXg20205501

[8]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasms associated with acute, painful musculoskeletal conditions.  *PDR* at 1931.

[9]Sonata or Zaleplon is used for short-term treatment of insomnia side effects include drowsiness, dizziness, lightheadedness, headache, constipation, muscle aches, chest pain, difficulty breathing, mental confusion, and depression.  *PDR* at 1793.

4

Plaintiff complained of pain in her hands, arms and low back; she could only walk for about a block before her left leg would drag.  (R. 247).

C.  Medical History

Although Plaintiff has received treatment from Dr. Gay since 1991, her visits became more frequent in 2000.  Muscle strain, cysts, chest pressure, costochondritis, and hypertension were treated conservatively between 1992 and 1999.  (R.130-162).  Dr. Gay also saw Plaintiff from March 29, 2000 to December 30, 2003; this doctor and his associates diagnosed tendonitis, left leg pain, hypertension, vertigo,[10] L5- S1 disc herniation, migraine, low grade sciatica, acute otitis media,[11] chronic back pain, chronic constipation, poorly controlled blood pressure, radicular pain cervicular, visual field defect, chest tightness, mild cervical spondylosis[12] and compression, rhinitis,[13] carpel tunnel, multi nodular goiter,[14] chronic depression, and toe fungus.  (R. 102-129, 184, 192, 194-197, 207, 209).  In June 2000, Dr. Gay prescribed 0.5mg Xanax,[15] twice per day.  (R. 126).

Dr. Michael Brooks, M.D., performed a lumbar MRI on July 10, 2000.  (R. 212-213).  He found disc degeneration at L5-S1 with an acute annular[16] tear and a central and left-sided disc herniation,[17] with ligamentum flavum[18] hypertrophy[19] contributing to mild central canal stenosis[20]

---

[10]Vertigo: An illusory sense that either the environment or one's own body is revolving, may result for diseases of the inner ear, sometimes erroneously used to mean any form of dizziness.  *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") (28th ed. 1994) at 1820.

[11]Otitis media: inflammation of the middle ear; tympanitis. otitis- inflammation of the ear, which may be marked by pain, fever, abnormalities of hearing, hearing loss, tinnitus, and vertigo.  *Dorland's* at 1204.

[12]Cervical spondylosis: Degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments, and connective tissue, sometimes with pain or paresthesia radiating down the arms as a result of pressure on the nerve roots.  *Dorland's* at 1564.

[13]Rhinitis: Inflamation of the mucous membrane of the nose.  *Dorland's* at 1459.

[14]Multi modular goiter: An enlarged thyroid gland containing circumscribed nodules within its substance.  *Dorland's* at 710.

[15]Xanax is indicated for the management of anxiety disorder.  *PDR* at 2763.

[16]annular- shaped like a ring.  *Dorland's* at 87.

[17]herniation is the abnormal protrusion of an organ or other body structure through a defect or natural opening in a covering membrane, muscle, or bone.  *Dorland's* at 759.

[18]ligamentun flavum- yellow ligaments: a series of bands of yellow elastic tissue attached to and extending between ventral portions of the laminae of two adjacent vertebrae, from the junction of the axis and the third cervical vertebra

and narrowing of the left lateral recess as well as mild encroachment upon the inferolateral[21] margin of the left neural foramen, without compression of the exiting nerve root. (R. 212).

From May 4 to September 27, 2000, Plaintiff completed orthopaedic treatment with Z.B. Friedenberg, M.D., with only peripheral improvement.  (R. 198).  On September 27, 2000, Dr. Friedenberg found a slightly positive tension by test to Plaintiff's left side, a reversed tension test, and weakness of the extensors of the toes in both peroneal.  (R. 198). Dr. Friedenberg recorded significant sensory loss over the inner border of the left foot, sciatic nerve tenderness, and a positive reversed tension test.  He recommended "consultation with a spine surgeon to see whether or not there would be a recommendation for a surgical procedure."  *Id.*  Dr. Friedenberg referred Plaintiff for physical therapy; she was prescribed pain medication.  (R. 94-101, 121).

Dan Gzesh, M.D., a neurologist at Mercy Hospital of Philadelphia, on October 24, 2001, observed a full range of motion in Plaintiff's cervical spine and modestly compromised lumbar flexion.  (R. 200, 201).  The doctor characterized Plaintiff as "an obese woman" with muscle weakness in her left leg, a diminished left ankle jerk, and decreased sensation in the L5-S1 distribution.  (R. 200, 201).  Dr. Gzesh's impression was Plaintiff had multiple objective signs of significant lumbar radiculopathy.  (R. 201).

Dell Burkey, M.D., of the Pain Medicine Center at the University of Pennsylvania Health System, examined Plaintiff on February 12, 2002. (R. 203-204).  This physician observed mild tenderness over Plaintiff's left lower back on palpation, guarding, and hesitancy to bend at approximately thirty five degrees.  (R. 204).  On the left leg, Plaintiff had normal sensation and

---

to the junction of the fifth lumbar vertebra and the sacrum.  *Dorland's* at 935.
[19]hypertrophy- the enlargement or overgrowth of an organ, or part due to an increase in the size of its constituent cells. *Dorland's* at 802.
[20]stenosis is the narrowing or stricture of  a duct or canal.  *Dorland's* at 1576.
[21]inferolateral- situated inferiorly and to one side.  *Dorland's* at 838.

motor strength, except for 4/5 knee extension and dorsiflexion.  *Id.*  Plaintiff's patella reflex was +1 on the left and straight leg raising was positive on the left at forty-five degrees.  (R. 204).  Dr. Burkey diagnosed L5 herniated disc, compressing the left nerve root and increased Plaintiff's Neurontin; also, he prescribed epidural injections, through March and April 2002.  (R. 104-05, 204).

An electromyogram ("EMG") and nerve conduction studies were conducted by Byrne L. Solberg, M.D., on November 22, 2002,  at Mercy Hospital of Philadelphia.  (R. 187, 192).  The EMG showed acute C5-C6 radiculopathy in Plaintiff's right arm, but no carpal tunnel syndrome, peripheral polyneuropathy, or brachial plexopathy.  (R. 187).  Physical examination revealed no areas of deformity or muscular atrophy.  (R. 187).

Plaintiff sought psychological treatment for depression, on October 10, 2003, stating, "[m]y husband thinks I am depressed."  (R. 218).  Bob Palladino, M.Ed., upon intake, assessed Plaintiff's major stressor to have occurred in 2001, when she was laid off from her nursing job and experiencing marital problems.  (R. 218).  Dr. Palladino's mental status evaluation revealed suicidal ideation within the prior year, passive homicidal ideation toward her ex-husband, and a physically abusive ex-boyfriend and her current husband.  *Id.*  Moreover, Plaintiff's behavior was depressed, with moderate anxiety.  (R. 218).  Dr. Palladino diagnosed major depressive disorder,[22] assigning Plaintiff a current GAF score of 50,[23] and estimated the highest GAF as 50 during the previous year. *Id.*

Dr. Cooney, completed a second psychiatric evaluation[24] on  November 7, 2003.  (R. 221,

---

[22]Dr. Palladino's diagnosis was major depressive disorder (296.32). Code number 296.3 indicate that the depression is recurrent.  The last "2" of 296.32 indicates the depression is of moderate severity.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 370 (4th ed. 1994) (*DSM-IV*).

[23]GAF scores between 41-50, as defined by the DSM IV indicate "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  *DSM-IV* at 34.

[24]Plaintiff's psychiatrists assessed as follows:

222).  Mental status exam revealed no suicidal or homicidal ideation, but described Plaintiff's mood

as depressed; she exhibited psychomotor retardation.[25]  (R. 222 ).   Dr. Cooney diagnosed major

depressive disorder with acute bereavement; she prescribed Effexor[26] and Sonata and assigned

Plaintiff a present GAF score of 45.  (R. 222).

D. State Agency Assessments

    1. *Consultative Examinations*

    After a Pennsylvania Bureau of Disability Determination examination, Ernesto Cruz, M.D.,

reported that Plaintiff experienced no chest pain and exhibited normal motion all four extremities

and her spine; Plaintiff's past medical history included hypertension, osteochondritis, and a caesarian

section.  (R. 163-165).  Dr. Cruz reported that Plaintiff was independent in most activities of daily

living and ambulated, without an assistive device, while performing her household chores.  (R. 163,

| Treating Psychiatrists | Axis I: Clinical Disorders | Axis II: Personality Disorders Mental Retardation | Axis III: General Medical Conditions | Axis IV: Psychosocial and Environmental Problems | Axis V: Global Assessment of Functioning (GAF) Scale |
|---|---|---|---|---|---|
| Marina Cooney (Nov. 7,2003) | Major Depression, Recurrent Severe (296.33) Acute Bereavement (V62.82) | Deferred | Chronic back and arm pain, history of goiter and hypertension | moderate to severe: chronic | Current 45- past year 60 |
| Bob Palladino (Oct. 7, 2003) | Major Depressive (296.32) | Deferred (799.99) | Migraines; bowel problems | Moderate | Current 50- past year 50 |

[25]Psychomotor retardation is the generalized slowing of mental and physical activities characteristic of depression. *Dorland's* at 1450.

[26]Effexor or Venlaxfine is used to treat mental depression and certain anxiety disorders, however it is not usually used to reduce stresses of everyday life. High or low blood pressure may make conditions worse.  May take 4 weeks or longer before you begin to feel better, probably need to take medicine for at least 6 months to prevent feelings of depression from returning.  Precautions while using this medicine may cause suicidal thoughts and tendencies or even become more depressed.  Venlafaxine may cause drowsiness.  Dizziness, lightheadedness, or fainting may occur, especially when you get up from a lying or sitting position.  Side effects of Effexor commonly include headache, high  blood pressure, constipation, dizziness, drowsiness.  Less common complication is chest pain. During adjustment to this drug possible side effects could include anxiety, diarrhea, headache, mental depression.  *PDR* at 3321.

164).  Plaintiff's medications were Neurontin, Vasotec, and Hydrochlorothiazide.[27]  (R. 165).  Dr. Cruz noted weakness in Plaintiff's left leg extensor hallucis longus[28] suggested potential L5 radiculopathy;[29] he recommended an electro-diagnostic examination consisting of electromyography and nerve conduction studies with physical therapy management.  (R. 166).

On December 30, 2003, Plaintiff complained to her treating physician, Dr. Gay, of chronic back and left leg pain, as well as tingling in both hands; this doctor diagnosed poorly controlled high blood pressure (163/118 and 160/110).  (R. 205).

2.  *Residual Functional Capacity Assessment*

Dr. P. D. Morris performed a physical residual functional capacity (RFC) assessment of Plaintiff on September 19, 2002, his primary diagnosis was weakness of the left extensor hallucis longus leg muscle; a secondary diagnosis was radiculopathtic pain.  (R. 170, 177).  Dr. Morris found Plaintiff able to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for six hours in an eight hour workday, sit for six hours with normal breaks, and push and/or pull without limitation, within the aforementioned weight restrictions.  (R. 171).  Occasionally Plaintiff could climb, balance, stoop, kneel, crouch, and crawl.  (R. 172-174).  Dr. Morris concluded that Plaintiff had never actively sought or been offered aggressive therapy for her back pain, noting that her pain required no analgesia beyond NSAIDs.[30]  (R. 175).  This evaluator concluded that Plaintiff's alleged physical limitations were not fully supported by the medical evidence.  (R. 175).

---

[27]Hydrochlorothiazide: Diuretic, used for treatment of hypertension and edema; administered orally. *Dorland's* at 783.

[28]Extensor hallucis longus- is one of the anterior leg muscles. It arises from the middle of the anterior surface of the fibula and inserts into the dorsal side of the base of the distal phalanx of the great toe.  It has many actions extension of great toe, dorsiflexes foot at the ankle, and inverts the foot at the ankle.  Extensor hallucis longus is innervated by the deep peroneal nerve (L5,S1).  It provides a means of testing the L5 and S1 nerve roots during the neurological examination. The patient is requested to 'pull the big toe back towards you' (dorsiflex) while the examiner resists this with forced plantarflexion. University of Washington, *Lower Extremity Muscle Atlas*, at http://www.rad.washington.edu/atlas2/exthallong.html

[29]Radiculopathy is a disease of the nerve roots. *Dorland's* at 1404.

[30]NSAID: Non-sterodial anti-inflammatory drug. *Dorland's* at 1153.

E. Vocational Expert Testimony

Vocational Expert, Nancy Harter, characterized Plaintiff's past job as a certified nursing assistant as semi-skilled, medium to heavy work; her job as a procurement clerk was semi-skilled, sedentary work. (R. 258-259). The VE testified that, although Plaintiff could not return to her prior position of procurement clerk as performed, she could, nevertheless, perform that job as it exists in the national economy. (R. 259). The VE agreed that Plaintiff could not perform the procurement clerk job if she was unable to concentrate two-thirds of the time. If Plaintiff was unable to concentrate only one third of the time, she could perform this job. (R. 260). The VE's testimony was consistent with information contained in the DOT. *Id.*

## III. **THE ALJ'S DECISION**

In concluding that the Plaintiff was not disabled at any time through his decision, on February 2, 2004, the ALJ made the following findings:

> 1. [Plaintiff] meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2. [Plaintiff] has engaged in substantial gainful activity since the alleged onset of disability. As I find the claimant was not disabled throughout the entire period of adjudication, it is not necessary to determine whether the claimant qualifies for an unsuccessful work attempt or later onset date.
>
> 3. [Plaintiff's] pinched nerve at C5-C6 causing radicular pain in the right upper extremity and a herniated disc at L5 causing radicular pain in the lower left extremity are severe impairments. I am unable to find severe impairments due to hypertension multi-nodular goiter, or major depression, recurrent. For the claimant's major depression, I find the following limitations: no restrictions on activities of daily living; mild difficulties in maintaining social functioning; mild to moderate difficulties in maintaining concentration, persistence, or

10

pace; and no episodes of decompensation.

4.  These  medically  determinable  impairments  do  not  meet  or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. I find that [Plaintiff's] allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The [Plaintiff] retains the residual functional capacity for sedentary work in a clean environment with a sit/stand option.

7. The [Plaintiff] is unable to perform her past relevant work as a nursing assistant and a childcare worker.  Based on a vocational expert's testimony, I find that the claimant's severe impairments do not prevent her from performing her past relevant work as a procurement clerk as generally performed in the national economy.

8. The [Plaintiff] was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

(R. 21).

## IV. <u>DISCUSSION</u>

A. <u>Standard of Judicial Review</u>

The role of this Court upon judicial review is to determine if substantial evidence in the administrative record supports the Commissioner's final decision.  *See Stunkard v. Sec'y of Health and Human Serv.*, 841 F.2d 57, 59 (3d Cir. 1988); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*citations omitted*).  It is more than a mere scintilla of evidence but may be less than a preponderance.  *See Stunkard*, 841 F.2d at 59.  It is the responsibility of the ALJ to resolve conflicts in the evidence, determine credibility of witnesses and weigh the evidence presented. *See Richardson*, 402 U.S. at

401.  This Court's review is not *de novo*, and the evidence of record will not be weighed a second time.  *See Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986), *cert. denied*, 482 U.S. 905 (1987).

B. Burden of Proof in Disability Proceedings

In order to be found "disabled" under the Act, a Plaintiff must carry the initial burden of demonstrating that she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A); 20 C.F.R. §§ 404.1505(a); 416.905(a).  Plaintiff may establish a disability through: (a) medical evidence meeting one or more of the serious impairments detailed in 20 C.F.R., Part 404, Subpart P, App. 1; or (b) proof that the impairment is severe enough that Plaintiff cannot engage in any type of "substantial gainful work which exists in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 460 (1983); 42 U.S.C. § 423 (d)(2)(A).

Under the first method, a Plaintiff is considered *per se* disabled by meeting one of the "listed" impairments.  Under the second method, a Plaintiff must initially demonstrate that a medically determinable disability prevents her from returning to employment.  *See Brown v. Bowen*, 845 F.2d 1211, 1214 (3d. Cir. 1988).  If Plaintiff proves that her impairment results in functional limitations to performing her past relevant work, then the burden of proof shifts to the Commissioner to prove that work does in fact exist in the national economy which Plaintiff is capable of performing given his or her age, education, and work experience. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  This is a two-fold analysis.  First, the Commissioner must evaluate the Plaintiff's job qualifications such as physical ability, age, education, and work experience. See 42 U.S.C. § 423

(d)(2)(A); 20 C.F.R. §§ 404.1520(f); 416.920(f).  Second, the Commissioner must consider, given Plaintiff's qualifications, whether jobs exist in the national economy that a similarly situated person could perform.  *See* 20 C.F.R. §§ 404.1520(f), 404.1566-69; 416.920(f), 416.966-69.

C. Review of the Administrative Law Judge's Decision

The ALJ, using the sequential evaluation process, concluded that Plaintiff could resume her prior work as a procurement clerk if it was modified to permit the option of alternating sitting and standing periodically and, therefore, denied her disability benefits.  (R. 19).  Plaintiff asserts that the ALJ: (1) improperly failed to assess the functional impact of her obesity, (2) erroneously found that Plaintiff's mental impairment is not severe, (3) erroneously found that Plaintiff could return to her position as procurement clerk, and (4) erroneously found that Plaintiff's statements regarding her impairments were not credible.  *Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment* ("*P. Br.*"), 18.   The Commissioner requests this court to affirm its finding that the Plaintiff is not disabled.  If the ALJ's decision that Plaintiff was not disabled at any time through the day of her decision is supported by substantial evidence in the record it should be affirmed.  *See* 42 U.S.C. § 405(g).  Therefore, the issue before this court is whether substantial evidence supports the Commissioner's determination that Plaintiff's mental and physical impairments do not render her disabled.

*1. The ALJ Failed to Properly Assess Plaintiff's Obesity.*

Plaintiff contends that the ALJ erred as a matter of law by failing to assess her obesity as required by Social Security Rulings 00-003p and 02-01p, because the opinion neglects to consider the effect of Plaintiff's weight on her physical limitations.  (*P. Br. 9*).  The Commissioner contends that Plaintiff was not disabled or limited by her alleged obesity since neither the record nor Plaintiff

revealed obesity to be disabling.  *Defendant's Brief in Support of Defendant's Motion for Summary Judgment* ("*D. Br.*"), 12.  In 2003, Plaintiff's weight fluctuated from 155 to 177 pounds; she is five feet one inch tall. (R. 58).  177 pounds, Plaintiff's highest recorded weight, corresponds to a Body-Mass Index ("BMI") of 33.  (R. 209, *P. Br.* 9).  A BMI above 30 is obese.[31]  Dr. Dan Gzesh noted, in his letter to Dr. Gay regarding his neurologic evaluation, that Plaintiff was "an obese woman." (R. 200).

This Court notes that failure to consider Plaintiff's obesity would not, standing alone, constitute reversible error.[32]  *See generally*, *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005) (holding that the ALJ's failure to consider Plaintiff's obesity – 245 lbs., 5'2" – did not necessitate remand where Plaintiff never mentioned to the ALJ obesity as a condition contributing to her inability to work). However, since, for reasons set forth below, this case must be remanded, the combined effect of all Plaintiff's impairments, including obesity, should be reviewed in determining whether Plaintiff's impairment meets or equals a listing.  *See* 20 C.F.R. § 404.1523.   Moreover, Social Security Rulings require the ALJ to consider the impact of a claimant's obesity throughout the sequential evaluation.  *See* SSR 02-01p. at *5.  The rulings recognize that obesity can exacerbate the effects of coexisting musculoskeletal impairments.  *See* SSR 00-3p and 02-01p; *see also Ulloa v. Barnhart*, 2003 U.S. Dist. LEXIS 18724 (N.D. Ill. 2003) (remanding to Commissioner for consideration of the impact of Plaintiff's obesity on her other conditions).   In this case, the ALJ failed to even mention Plaintiff's obesity in assessing the extent of Plaintiff's impairments though

---

[31]Department of Health and Human Services, National Institutes of Health, Aim for a Healthy Weight: Information for Patients and the Public, *available at* http://www.nhlbi.nih.gov/health/public/heart/obesity/lose_wt/risk.htm.

[32]This Court notes that Plaintiff's weight is far below that recognized as obese under the Commissioner's prior regulations.  *See* SSR 00-3p (*superseded by* SSR 02-1p).  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.09 required that a female claimant at 61 inches weigh 236 pounds to qualify as obese.  Moreover, 177 is Plaintiff's peak weight; her last-recorded weight was 172.  (R. 205).

Plaintiff complained of difficulty walking and chronic back pain.  Hence, this court cannot determine whether she followed the Social Security Rulings.[33]  Upon remand, the ALJ shall expressly consider the impact of Plaintiff's obesity on her combined impairments.

    *2. The ALJ's Conclusion that Plaintiff's Mental Impairment is "Not Severe" is Unsupported.*

    Plaintiff further contends that the ALJ failed to properly evaluate her testimony and the medical evidence  regarding the impact of her depression.  *P. Br. 15.*  The ALJ properly found that Plaintiff had severe physical impairments, including a pinched nerve at C5-C6 causing radicular pain in the right upper extremity and a herniated disc at L5 causing radicular pain in the lower left extremity.  (R. 17).  However, the ALJ did not find that Plaintiff had any severe impairments resulting from her major depression.  *Id.*  This conclusion is both factually and legally erroneous, hence remand for further development of the record is required.

    A non-severe impairment is one that does not significantly limit, or only has minimal effect on, a claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1521(a); *see also Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987).  The severity step should only be used to screen out *de minimus* claims.  *See generally Harper v. Sullivan*, 1991 U.S. Dist. LEXIS 2168 (E.D. Pa. 1991).  If an adjudicator finds that symptoms cause limitations or restrictions having more than a minimal effect on an individual's ability to do basic work activities,[34] the adjudicator must find that an impairment is severe.  20 C.F.R. § 404.1528(a); Social Security Ruling 96-3p and 96-4p.

    In assessing Plaintiff's mental impairments, the ALJ stated that she would:

        assess the degree of functional limitation imposed by this mental

---

[33] *See* 20 C.F.R. § 402.35(b)(1).

[34] Basic work activities are "abilities and aptitudes necessary to do most jobs," 20 C.F.R. § 404.1521(b), including "seeing, hearing, and speaking; understanding, carrying out and remembering simple instructions; use of judgment, responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting."  Social Security Ruling 85-28.

> impairment in the following four categories: restriction of activities
> on daily living [sic]; difficulties in maintaining social functioning;
> difficulties in maintaining concentration, persistence, or pace; and
> episodes of decompensation (20 C.F.R. § 440.1520a) [sic].   The
> regulations state that a mental impairment is generally classified as
> severe if the impairment imposes a moderate functional limitation (20
> C.F.R. § 404.1520a(d)(1)).

(R. 18).  The ALJ after analyzing Plaintiff's mental impairment, relying on Plaintiff's testimony and

Dr. Cooney's treatment notes, concluded that:

> No treating physician has provided an assessment of this mental
> impairment.   The claimant states that her activities of daily living
> have decreased, but her testimony still shows an active lifestyle.  She
> runs her house with some assistance from her children, visits her
> mother, and watches television.   Dr. Cooney's December 2003
> treatment note shows some decreased energy, so there is some
> evidence that her activities of daily living have decreased.    I
> accordingly find a mild limitation.  As for social functioning, the
> claimant visits her mother daily, uses public transportation, and
> shops, and this suggests mild difficulties in maintaining social
> functioning.  Although Dr. Cooney found that the claimant had a fair
> concentration, the claimant testified that she has some problems
> concentrating.  I will give the claimant the benefit of the doubt and
> find mild to moderate difficulties in concentration.   There is *no
> medical evidence of any episode of decompensation*.  Therefore, I find
> the following limitations: mild restriction on activities of daily living;
> mild difficulties in maintaining social functioning; mild to moderate
> difficulties in maintaining concentration, persistence, or pace; and no
> episodes of decompensation.  As there is *no moderate limitation*, I am
> unable to find her major depression a severe impairment.

(R. 18). *(citations omitted) (emphasis added)*.

In finding that Plaintiff's medical record revealed no episodes of decompensation, the ALJ

overlooked contrary medical evidence, without explanation.  Dr. Gay noted on October 16, 2001 that

Plaintiff was seen in the emergency room for a stress-related anxiety attack.  (R. 108).  The ALJ may

not reject, without explanation, this solitary reference to Plaintiff's ER visit which supports a finding

of one incident of decompensation.  *See Fargnoli v. Massanari*, 247 F.3d 34 (3d Cir. 2001).  Because

Social Security proceedings require a fact-specific inquiry concerning only the claim before the ALJ, it is "the ALJ's duty to investigate the facts and develop the arguments for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000); *see also*, S.S.R. 00-4p.   Dr. Gay's notes also indicate that he prescribed Xanax, a drug commonly used to treat anxiety, in June 2000.   The ALJ asked neither Plaintiff nor her physician why Xanax was prescribed.   Finally, Plaintiff testified that she suffered anxiety attacks.  (R. 248, 252).   In light of three separate indications in the record that Plaintiff has suffered anxiety in the past, the ALJ, without explanation, improperly found no episodes of decompensation.

Using § 404.1520(a), the ALJ identified "the need for additional evidence" when she observed that "no treating physician has provided an assessment of this mental impairment."  *See* 20 C.F.R. § 404.1520a(a)(1); (R. 18).   The ALJ, however, failed to obtain this assessment, rendering a decision solely based on her lay opinion of Plaintiff's limitations.  *See generally Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (stating that an ALJ is prohibited from making "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion). 20 C.F.R. § 404.1520a(b)(1) requires the ALJ to document her findings "in the decision."   This regulation requires a decision that is based upon a listing of functional limitations provided by a medical or psychological expert.  See 20 C.F.R. § 404.1520a(e)(1) and (2) (explaining that the Agency's "medical or psychological consultant has overall responsibility for assessing medical severity" and the ALJ's written decision must incorporate the pertinent findings and conclusions based on the technique.")   The ALJ correctly noted that the record contained no medical assessment, but ignored her duty to sufficiently develop the record before concluding that

Plaintiff's mental impairment was not severe. Though the ALJ's disability determination considered the possibility that Plaintiff might suffer loss of concentration, it did not allow for possible "limitations in understanding, remembering, and carrying out instructions" or "responding appropriately to supervision, co-workers, and work pressure." 20 C.F.R. § 404.1545(c).

Moreover, in requiring that Plaintiff's mental impairment impose a moderate functional limitation, the ALJ applied an incorrect legal standard. While "slight abnormalities" that cause no more than minimal functional limitation, are not disabling, 20 C.F.R. § 404.1524(c), any impairment that imposes more than a mild limitation meets the step-two severity requirement. *See id.* Accordingly the ALJ, imposed a more exacting step-two standard than that imposed by the regulations, by requiring that Plaintiff's depression constitute a "moderate" limitation to merit designation as severe. *See* §404.1520(c) and *Bowen v. Yuckert*, 482 U.S. 137 (1987).

Furthermore, the ALJ misinterpreted Plaintiff's Global Assessment of Functioning ("GAF") score. Upon initial intake, Dr. Palladino assigned Plaintiff a GAF score of 50. (R. 218). According to the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"),[35] a GAF score between 41 and 50 corresponds to "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."[36] Following the death of her sister, Plaintiff's GAF score, according to her treating psychiatrist, Dr. Cooney, dropped to 45. In discussing Plaintiff's GAF score, the ALJ acknowledged that:

> ... a score [of 45] would probably constitute a severe

---

[35]American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed. 2000).

[36]The DSM-IV directs psychiatrists to consider "psychological, social and occupational functioning on a hypothetical continuum of mental health," and the GAF score represents the "individual's overall level of functioning." A normal GAF score would be at or above 70. A GAF score between 61 and 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning. *Id.*

> impairment; however, the GAF score a month before was 50.  The only difference between these two scores was the passing of the claimant's sister.  In fact this is noted in the diagnosis as acute bereavement.  It appears then that the GAF score of 45 is temporarily low.  Regardless, as stated below, even if I found this condition a severe impairment and found a resulting occasional problem with concentration (up to one-third of an eight hour work day), the claimant would still be able to perform one of her past relevant occupations.

(R. 18).

Although Plaintiff's a GAF score of 45 may have been transient, Dr. Cooney failed to quantify the duration of Plaintiff's acute bereavement.  (R. 222).  Rather, Dr. Cooney diagnosed Plaintiff as suffering from major depression, recurrent and "severe".  (R. 222).  The ALJ, substituted her own unsupported medical judgment in determining that Plaintiff's GAF score was only temporarily and "not severe."  Upon remand the ALJ shall obtain a complete mental assessment of how Plaintiff's depression impacts her work related functions.[37]

> 3. *The ALJ's Determination that Plaintiff Can Perform Her Past Relevant Work is Not Supported by Substantial Evidence.*

Plaintiff contends that the ALJ's determination that she can return to her past position as a procurement clerk is not supported by substantial evidence, because the ALJ did not consider all of her impairments supported by the record.  The Commissioner denies that it ignored, any of Plaintiff's impairments or their impact on her ability to do work.  *D. Br. 23*.  The ALJ adequately accounted for Plaintiff's disc degeneration and pain in finding that she would require a sit/stand option.  *Id.* Also the ALJ's finding regarding Plaintiff's exertional impairments is medically supported.  The VE's testimony is consistent with the Dictionary of Occupational Titles ("DOT") regarding these

---

[37]If the ALJ on remand finds that Plaintiff's mental impairment is severe, the ALJ and the VE must address its impact on Plaintiff's ability to do sedentary tasks.  *See Gilliland v. Heckler*, 786 F.2d 178 (3d Cir. 1986).  Furthermore, a residual functional capacity determination must measure the claimant's ability to meet the minimal standards of a sustained competitive work setting.  *Caffee v. Schweiker*, 752 F.2d 63 (3d Cir. 1985).

impairments. (R. 260). However, as the ALJ improperly determined that Plaintiff's non-exertional limitations were non-severe, no mental limitations were included in her RFC formulation and the subsequent determination that Plaintiff could perform her past relevant work as a procurement clerk.

In determining whether a claimant can perform past relevant work, the claimant is the primary source for information regarding the requirements of the particular job. *Burnett v. Commissioner*, 220 F.3d 112, 123 (3d Cir. 2000). The determination that a claimant can perform past relevant work requires consideration of (1) the claimant's statements as to which past work requirements can no longer be met and the reasons why they can no longer be met; (2) medical evidence establishing how the impairment limits the claimant's ability to meet those requirements; and (3) in some cases, supplemental information on how the work is performed generally in the economy. *Id.* The ALJ may not however, use supplemental evidence from other sources, such as the Dictionary of Occupational Titles ("DOT") or a VE's testimony, to re-characterize or contradict Plaintiff's description of her past relevant work. *See Burnett*, 220 F.3d at 124 (referring to S.S.R. 82-62). Finally, the ALJ's RFC must be accompanied by "a clear and satisfactory explanation of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

Having decided at step two in the sequential evaluation process that Plaintiff's mental impairments were not severe, the ALJ's determination that Plaintiff can resume her past position as a procurement clerk may be flawed. The ALJ noted in assessing Plaintiff's depression that, "even if I found this condition a severe impairment and found a resulting occasional problem with concentration (up to one-third of an eight hour work day), the claimant would still be able to perform one of her past relevant occupations." (R. 18). This is an erroneous conclusion, because the ALJ made it without the benefit of an accurate medical assessment of Plaintiff's ability to concentrate.

*4. The ALJ's Credibility Determination is Not Properly Supported by the Evidence.*

Finally, Plaintiff contends that the ALJ's determination regarding her credibility is not properly supported by the evidence. *P. Br. 18*. Ordinarily, a reviewing court defers to the ALJ's credibility determination because he or she was afforded an opportunity, during the hearing, to assess the witness' demeanor. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). However, the ALJ must indicate what evidence he is rejecting and provide valid reasons for discounting that evidence. *See Fargnoli*, 247 F.3d at 43 (citing *Burnett*, 220 F.3d at 121). Where such testimony is reasonably supported by medical evidence an ALJ may not discount such evidence without contrary medical evidence. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

The ALJ found that the Plaintiff's "allegations regarding her limitations are not totally credible" (R. 21), for three reasons. First, the ALJ disbelieved Plaintiff's allegation that she "is unable to lift over five pounds and can sit for only 20 minutes and stand for 30 minutes before experiencing pain," because Plaintiff worked at a day care center after her alleged onset date and until May 2003. (R. 19). Furthermore, Plaintiff's treatment notes do not reflect an exacerbation of Plaintiff's condition after she stopped working. (R. 19). Secondly, Plaintiff's daily activities – visiting her mother, maintaining her household with the help of her children, and using public transportation – belie a claim of disabling back pain. (R. 19). Finally, Plaintiff's treating physician, Dr. Gay, placed no permanent restrictions on his patient and his May 2003 letter stated that Plaintiff's impairments were "only causing an increased difficulty in working," (R. 19), not total disability.

The ALJ relies on the absence of restrictions placed on Plaintiff by her physicians as indicating that her allegations of pain were not wholly credible. However, Dr. Gay placed certain

21

lifting restrictions on Plaintiff in December 2000 (R. 116). While he imposed no further restrictions, Dr. Gay noted that Plaintiff's impairments caused increased difficulty working. (R. 178). The ALJ's reliance on Plaintiff's daily activities is erroneous, because the ability to take public transportation or engage in other transient activities is not indicative of the capacity to sustain work throughout an eight hour day, five days a week. Moreover, the absence of formal restrictions on Plaintiff is not contrary medical evidence upon which the ALJ should discredit Plaintiff's testimony regarding her limitations.

The ALJ's reliance on the Plaintiff's "active lifestyle" is not conclusive. Though an ALJ may consider the activities that constitute a claimant's daily routine, *Burns v. Barnhart*, 312 F.3d 113 (3d Cir. 2002), a vegetative, reclusive lifestyle is not a requisite to disability. *Smith v. Califiano*, 637 F.2d 968 (3d Cir. 1981). The ALJ determined that, despite Plaintiff's complaints of pain, including difficulty lifting more than five pounds, inability to walk more than one block before resting, and the frequent need to change positions, Plaintiff's active lifestyle was inconsistent with disability. (R. 19). However, the Plaintiff's testimony regarding her daily activities indicates a consistent decline in her capacity to perform everyday tasks. (R. 248-54). Plaintiff no longer dances (R. 254) and has had increasing difficulty performing household chores such as washing dishes or cleaning the bathtub. (R. 251-52). The record does not reflect how Plaintiff interacts socially or functions on a daily basis.

Moreover, the ALJ accorded great weight to the fact that Plaintiff worked until May 2003, (R. 19), while ignoring Plaintiff's testimony that she left daycare work because of her physical impairments, physical pain and concern of her supervisor that while "lifting the children, . . . [she] could drop a child in transferring it from the table," (R. 242), without contrary medical evidence to

support her finding of incredulity.  Therefore, the ALJ's determination that Plaintiff's allegations regarding her pain-related limitations were not wholly credible is not supported by substantial evidence.

D. On Remand

For the reasons set forth above, this case should be remanded[38] for a new sequential evaluation consistent with this decision, commencing with step one.[39]  At step two the ALJ shall reevaluate the severity of Plaintiff's mental impairment.  The ALJ must consider the impact, if any, of Plaintiff's weight on her exertional limitations, in combination with her credible mental impairments, as evidenced by a mental RFC, and the credibility of Plaintiff's subjective complaints in light of the fully developed record.

---

[38]This Court notes that Plaintiff is currently fifty-one years old, a factor for which the ALJ must account upon remand.
[39]The ALJ should re-evaluate her decision at step one as there are inconsistencies in her decision.  On page 2 of her report, ALJ Volkman states that Plaintiff's childcare work "would constitute substantial gainful activity." (R. 13). However, on page 8, ALJ Volkman notes that the childcare work "did not constitute disqualifying substantial gainful activity." (R. 19).  On remand, the ALJ shall determine definitively if Plaintiff's childcare work constituted substantial gainful activity (20 C.F.R. § 404.1572) or represented an unsuccessful work attempt (20 C.F.R. § 404.1574(c).

## V. <u>CONCLUSION</u>

Based upon its thorough review of the record, this court finds that several important aspects of the ALJ's decision are not supported by substantial evidence.  Accordingly, I make the following:

## <u>RECOMMENDATION</u>

AND NOW, this 28th day of June, 2005, it is respectfully recommended that:

1.    The Report and Recommendation be APPROVED and ADOPTED;

2.    The Plaintiff's Motion for Summary Judgment be GRANTED in part and DENIED in part;

3.    The Commissioner's Motion for Summary Judgment be DENIED; and

4.    The matter be REMANDED to the Commissioner of Social Security to allow the Administrative Law Judge to conduct additional proceedings consistent with this Report and Recommendation.  Upon remand, the ALJ shall: (a) assess the impact of Plaintiff's obesity on each of her physical limitations; (b) evaluate the severity of Plaintiff's mental impairments and obtain a mental RFC; (c) reassess Plaintiff's credibility giving medical support; and (d) if necessary, submit to a vocational expert all of Plaintiff's legitimate significant mental and physical limitations to determine what positions, if any, Plaintiff could perform in the national economy.

It is so ORDERED.

BY THE COURT:

*/s/ Carol Sandra Moore Wells*
CAROL SANDRA MOORE WELLS
United States Magistrate Judge